**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON**

**CIVIL ACTION NO. 06-182-JBC**

**PEGGY JEAN PERRIN,**                                                                 **PLAINTIFF,**

**V.**                                        **MEMORANDUM OPINION AND ORDER**

**HARTFORD LIFE INSURANCE COMPANY,**                              **DEFENDANT.**

**\* \* \* \* \* \* \* \* \* \***

This matter is before the court on the plaintiff's motion to reverse an administrative decision (DE 11).  The court, having reviewed the record and being otherwise sufficiently advised, will grant the plaintiff's motion and award the plaintiff the past-due benefits to which she is entitled.

**I. Factual Background**

*A. The Plaintiff's Initial Disability*

The plaintiff, Peggy Jean Perrin, was most recently employed by Kentucky Central as a Customer Service Representative.  AR 2.  She worked at Kentucky Central five days, or 37.5 hours, per week.  AR 671.  Among other duties, the plaintiff's job required her to perform data entry; correspond with accounts by telephone and letter; regularly follow up on accounts; determine refunds and issue checks for terminated accounts; and display knowledge of refund methods and the "rules of all states."  AR 735.  Physically, her job demanded that she lift and carry up to ten pounds as often as once per day and up to five pounds as often as ten times per day.  AR 486, 736.  It also required her to sit for 90% of the day; the

other 10% of her workday was spent walking, standing, and stooping.  *Id.*  Finally, she needed to be able to frequently reach above and below her head.  *Id.*[1]

The plaintiff last worked at Kentucky Central on January 8, 1990.  AR 2, 671.  On her way to work on January 9, 1990, she was involved in a motor vehicle accident.  AR 671.  As a result, the plaintiff underwent corrective back surgery and jaw surgery on February 16, 1990, and August 27, 1990, respectively.  *Id.*  Following these operations, Dr. Phillip Hylton, the doctor who performed her back surgery, informed the defendant that the plaintiff had a permanent impairment rating of approximately 15%.  AR 703.  He also recommended that she avoid repetitive and prolonged bending, pulling, lifting, or sitting activities.  *Id.*

The plaintiff applied for long-term disability benefits from the defendant, and, after she satisfied the elimination period, the defendant initially approved her claim under the terms of her long-term disability benefits policy (hereinafter "LTD policy").[2]  Pursuant to the LTD policy language, benefits are payable to the plaintiff if she is "totally disabled," which is defined as being "unable, solely because of accidental bodily injury or sickness, to engage in all the material and substantial

---

[1]Specifically, her employer stated that the plaintiff was required to reach: (1) below her head to the right side for 25% of the day; (2) below her head to the left side for 25% of the day; (3) above her head to the right side for 25% of the day; and (4) above her head to the left side for 25% of the day.

[2]The date on which the defendant approved the plaintiff's claim is unclear.  Though correspondence from the defendant states that the plaintiff's claim was approved on November 12, 1990, *see* AR 168, the defendant's records indicate that it approved her claim on April 4, 1992.  *See* AR 38.

2

duties of your occupation."  AR 3.  The defendant informed the plaintiff that benefits would be payable only so long as she remained "totally disabled."  AR 3-4, 168.

### B. The Plaintiff's Medical Exams Prior to the Termination of her Benefits

On March 21, 2000, the plaintiff saw Dr. Stephen Royse, who found that the plaintiff could sit and stand for only two to four hours per day and could walk for only two hours per day.  AR 503.  He also found that she had limited pushing and pulling abilities and that her repetitive hand motion was limited by her neck and back pain.  *Id.*  On May 11, 2000, Dr. Royse stated that she could sit, stand, walk, and drive for only one hour each during an eight-hour workday.  AR 490-91.  Though he found that the plaintiff could frequently lift one to ten pounds and that she could frequently perform reaching, handling, fingering, and feeling functions, Dr. Royse stated that the plaintiff could not perform sedentary work or return to her former job.  *Id.*  On August 15, 2000, Dr. Aleksandr Mogilevski found that the plaintiff had "some restriction on her neck forward bending and significant restrictions on attempts to perform lateral turns."  AR 462.  He also believed that she could move her neck only a maximum of thirty degrees in either direction.  *Id.*  Dr. Mogilevski diagnosed the plaintiff with chronic lumbar and cervical pain, most likely associated with degenerative disc disease; he also expressed concern that the plaintiff had the potential for developing cervical or lumbar stenosis.  AR 463.

Despite the fact that information in the defendant's work file regarding the

3

plaintiff suggests that it was "probable that [she was] disabled" as of June 22, 2000, the defendant concluded that the plaintiff no longer met the definition of disability on October 20, 2000, after her examination by Dr. Mogilevski.  AR 47, 51.  The plaintiff subsequently underwent a functional capacity evaluation ("FCE") on March 29, 2001, which was performed by Sherry Wesley.  Though the plaintiff's performance suggested that she could perform some tasks at the sedentary exertional level, *see* AR 434-35, Ms. Wesley found that the plaintiff's endurance was poor and that her pain levels increased with activity longer than thirty minutes.  AR 408.  Ms. Wesley stated that the plaintiff was able to work at the sedentary level for a maximum of two hours per day.  AR 408, 436.  Notably, Ms. Wesley also found that the plaintiff "passed all the validity criteria and there were no indications of symptom disability exaggeration."  AR 437.  On May 31, 2001, the defendant's examining nurse similarly concluded that the plaintiff was "unable to return to her own [occupation]."  AR 42-43.

*C. The 2004 FCE*

On May 21, 2004, the defendant sent a letter to Dr. Royse asking him to state whether he believed the plaintiff was capable of performing part-time or full-time sedentary work that did not require prolonged standing or walking or heavy lifting.[3]  AR 173.  On May 25, 2004, Dr. Royse responded by recommending that

---

[3]This letter also stated: "We stipulate that Ms. Perrin is unable to return to work in any occupation requiring prolonged standing, walking, repetitive bending/stooping or moderate lifting . . . ."  AR 173.

4

the plaintiff undergo another FCE, and he subsequently referred her to a therapist
for that purpose.  AR 174, 177.

       This FCE was performed on August 23 and 24, 2004, by Tara Long.  In this
FCE, the tests performed on Day 1 were repeated on Day 2 "for consistency and
reliability."  AR 285.  However, Ms. Long reported that the plaintiff failed to
demonstrate a consistent level of performance from Day 1 of the FCE to Day 2.  *Id.*
Ms. Long specifically found that the plaintiff's "objective physical manifestations
did not match her verbal complaints of pain" and that "[p]ain behavior and
symptom magnification interfered in all of the testing activities on day 2."  AR 286.
Ms. Long therefore concluded that the test results did not indicate "consistent
maximal abilities, but rather the level of work effort she was willing to provide for
these activities."  AR 285.  Nonetheless, Ms. Long noted that the plaintiff
demonstrated a whole body active range of motion and strength that was within
functional limits to complete the FCE; excellent balance; good functional motor
skills; and good tolerance to activities involving standing and sitting.  AR 286.  Ms.
Long also determined, however, that the plaintiff could sit for only 34-66% of a
workday; when performing this test, the plaintiff frequently shifted her weight,
demonstrated a loss of ability to maintain a good sitting position, and reported
discomfort in her lower left extremity.  AR 290.  Ms. Long concluded the plaintiff
could maintain sedentary to light work for an eight-hour workday, though she also
noted that "final results may not reflect this due to [the plaintiff's] subjective

5

intolerance due to pain particularly on day 2 of testing." AR 286. She also stated that the plaintiff's job description was "not requested." *Id.*

The plaintiff claims that she woke up "very sore" following her first day of testing. AR 162. When she arrived for her second day of testing, she states that she was "really in pain, [she] was hurting so bad." *Id.* Her husband then drove her to a grocery store so that she could purchase some Ben Gay heating wraps.[4] AR 162. When she returned to the examination site to complete her FCE, the plaintiff stated that she was still in pain from doing "too much" the previous day and, after attempting to complete the FCE, informed Ms. Long that she could not perform the requested exercises. AR 163, 285, 286.

### D. The Termination of the Plaintiff's Benefits

On September 17, 2004, the defendant terminated the plaintiff's access to benefits under her LTD policy. AR 3-6. In doing so, it explicitly claimed that her job was "sedentary in demand" and that, since "the results of her FCE show[ed] that [she was] capable of performing at a sedentary to light capacity," she was no longer disabled under the policy's terms. AR 5.

### E. The Plaintiff's Post-Denial Examinations and Appeal

On September 1, 2004, the plaintiff again saw Dr. Royse, who stated that the plaintiff believed her pain had worsened since the FCE. AR 203. Though her range of motion and reflexes were normal, Dr. Royse opined that the plaintiff "still

---

[4]The receipt for these heating wraps is found at AR 200.

6

appears unable to work."  AR 203.  He referred her for an MRI exam, which was performed on September 21, 2004.  AR 210.  This MRI showed abnormalities at the C5-6 disc and C6-7 disc which caused foraminal narrowing at the C5-6 level. AR 210, 213.  The MRI also showed abnormalities in her lower back, including a narrowing of her spinal canal.  AR 210, 213.  Dr. Royse again stated that she was unable to work and referred her to Dr. Leon Ravvin, a neurosurgeon, for further testing.  AR 213-14.

Dr. Ravvin examined the plaintiff on October 6, 2004.  He found that the plaintiff had a reasonably good range of movement and no sensory deficit or reflex abnormalities in the upper or lower extremities.  AR 217.  He also saw no evidence of disc herniation or spinal stenosis in her MRI.  *Id.*  He concluded that surgery was not warranted at the time but found that, if her symptoms persisted, she could be a candidate for decompression and instrumented fusion at L3-4 and possibly L4-5. AR 217-18.

On November 17, 2004, the plaintiff notified the defendant that she wished to appeal its decision to terminate her benefits.  AR 223.  At this point, the defendant submitted the plaintiff's file for an independent review by Dr. Robert Marks, a physician who works with University Disability Consortium ("UDC").  Dr. Marks noted that the plaintiff had not seen Dr. Hylton, the physician who performed her back surgery, since 1993 and that she saw Dr. Royse only intermittently for general medical care and the prescription of pain medications.  AR

80.  He also reviewed the plaintiff's FCE evaluations and concluded that "considering purely physical considerations, . . . both FCEs do demonstrate that the claimant is capable of at least sedentary level work. . . . [W]ith regard to attempts at maximum effort, there is a question of reliability/validity on the part of the claimant.  It is probable that the fear of injuring herself was greater than the actual risk."  AR 89.  Dr. Marks also stated that the plaintiff should be able to stand for no more than 30 to 40 minutes at a time and that it would be possible for her to change position at a sedentary occupation, which minimized the importance of her claim that she cannot sit for more than 30 minutes at a time.  *Id.*  He ultimately concluded, however, that the plaintiff's position "be at the sedentary level of effort, and that the position not require frequent and extreme movements of the head or the neck, frequent reaching or lifting of weight greater than 5 lbs overhead . . . ."  AR 88.[5]

On April 25, 2005, the defendant denied the plaintiff's appeal and upheld its termination of her benefits.  AR 93-95.  In doing so, it referred extensively to Dr. Marks's evaluation of the plaintiff's medical records.  It further stated:

> We realize that you continue to have some pain and discomfort related to your cervical and lumbar degenerative disc disease.  However, the medical documentation available to us indicates that in the last several years, you have seen Dr. Royse infrequently for general medical care. We have no record of referral to a Pain Management specialist, or physical therapy and/or work hardening, as suggested in the FCE of

---

[5]Dr. Marks also claimed that, despite repeated attempts, he was unable to contact Drs. Royse and Ravvin in completing his evaluation of the plaintiff's ability to work.  AR 87-88.

8

2001.   Consultations with Dr. Mogilevski and Dr. Ravvin have not resulted in recommendations of surgery, and have not documented significant physical limitations or restrictions on examination.

AR 95.

### F. Further Proceedings

Following the denial of her appeal, the plaintiff informed the defendant that she felt that her claim had not been handled fairly,[6] and the defendant permitted her to submit additional evidence of her disability for their consideration.  AR 92.  The plaintiff presented records from her visit with a Dr. Tallia on May 3, 2005, who opined that the plaintiff could not maintain gainful employment "even [at a] sedentary job.  Prolonged sitting and forward posture worsens discogenic problems."  AR 69.  On May 17, 2005, the plaintiff again saw Dr. Ravvin, who noted her continuing symptoms of back pain and her history of conservative treatment.  AR 66.  Dr. Ravvin stated that the plaintiff was "unable to work" and that "[h]er disability checks have been stopped."  *Id.*  He also opined that she "has a significant back problem" but that conservative treatment was reasonable at that time.  *Id.*

After its review of this additional evidence, the defendant adhered to its decision to terminate the plaintiff's benefits.  Having exhausted her administrative remedies, the plaintiff commenced this suit for judicial review.

---

[6]In February of 2004, the defendant offered the plaintiff $40,000 as a lump sum settlement of her claim for disability payments.  AR 157.  The plaintiff rejected this offer, and she believes that this rejection motivated the defendant's termination of her benefits.  AR 92, 164.

**II. Standard of Review**

This action is a suit to recover long-term disability benefits.  The plaintiff's LTD policy is governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*  Under ERISA, a district court analyzes the decision of the Plan administrator under either a *de novo* or an "arbitrary and capricious" review standard, depending on whether the Plan grants the administrator discretionary authority.  *Sanford v. Harvard Indus., Inc.,* 262 F.3d 590, 595 (6th Cir. 2001).  Though a plan policy need not use the term "discretionary" or other specific terminology to vest such authority in the administrator, a plan must contain a clear grant of discretion to the administrator for the "arbitrary and capricious" standard to apply.  *Hoover v. Provident Life and Accident Ins. Co.,* 290 F.3d 801, 807 (6th Cir. 2002).

In this case, the policy language reads as follows: "*Subject to due written proof of loss*, all accrued indemnity for disability will be paid monthly and any balance remaining unpaid upon the termination of the period of liability will be paid immediately upon receipt of *due written proof*."  AR 197 (emphasis added).  The defendant claims that the term "due written proof" is sufficient to confer discretionary authority on a plan administrator since the phrase suggests that an administrator will need to exercise its judgment in determining a claimant's entitlement to benefits.

This issue is apparently a matter of some dispute within the Sixth Circuit.  In

10

*Leeal v. Continental Casualty Co.*, 17 Fed. Appx. 341 (6th Cir. 2001), the Sixth

Circuit concluded, *per curiam*, that language similar to that of the plaintiff's LTD

policy was sufficient to confer discretion on the plan administrator because it

"implicitly assumes a plan administrator will need to judge the evidence submitted

by a claimant for its adequacy." *Id.* at 342.  However, the *Leeal* court relied on

*Perez v. Aetna Life Insurance Co.*, 150 F.3d 550 (6th Cir. 1998) (en banc) ("*Perez

II*"), and *Bollenbacher v. Helena Chemical Co.*, 926 F. Supp. 781 (N.D. Ind. 1996),

two cases which involved policy language much different from that seen in the

plaintiff's LTD policy.  In *Perez II*, the policy at issue provided:

> Written proof of total disability must be furnished to [Aetna] within 90
> days after the expiration of [the first twelve months of disability].
> Subsequent written proof of the continuance of such disability must be
> furnished to [Aetna] at such intervals as [Aetna] may reasonably require
> . . . . [Aetna] shall have the right to require as part of the proof of claim
> satisfactory evidence . . . that [the claimant] has furnished all required
> proofs for such benefits . . . .

*Id.* at 555.  The policy in *Bollenbacher* provided that benefits would be paid "when

the company receives proof that the individual is disabled due to sickness or injury

and requires the regular attendance of a physician."  *Id.* at 786.  The policy at issue

here merely provides that accrued indemnity for disability will be paid monthly

subject to due written proof of loss, making this case distinguishable from *Perez II*

and *Bollenbacher*.

    More recently, the Sixth Circuit in *Hoover* construed language similar to that

at issue here not to confer discretionary authority on the plan administrator:

> The requirement that the insured submit written proof of loss, without more, does not contain "a clear grant of discretion [to Provident] to determine benefits or interpret the plan." *Perez*, 150 F.3d at 557 (citations omitted). The policies do not expressly state that the administrator has discretion over the determination of residual benefits, nor is there language requiring "satisfactory" proof of a disability. Instead, the policies permit Provident only to require proof to determine financial loss. . . . The language relied upon by Provident in no way equals a grant of discretion in determining whether Hoover suffers from a medical condition rendering her unable to work.

*Id.* at 808. This description is equally applicable to the plaintiff's LTD policy. Nowhere does the plaintiff's policy state or imply that the defendant had the discretion to determine whether the plaintiff is medically disabled. In the context of the policy as a whole, the phrase "due written proof" appears to refer more to the timing of the payment than the discretion vested in the plan administrator.

Indeed, this court has previously held that policy language identical to that used in the plaintiff's policy was insufficient to vest discretionary authority in a plan administrator.

> The language the Defendant seizes upon to prove this "clear grant" is that in the policy which requires "*due* written proof of loss." However, it is evident from the context of this language that the word "due" refers only to the timeliness of the written proof -- the preceding paragraphs contain language indicating that the written proof must be "furnished within 90 days after the commencement of the period for which the Hartford is liable." Although "magic words" are not required, the grant of discretion must at least be clear. Here there is no discretion given to the plan administrator to determine whether the evidence submitted by a claimant is satisfactory, and the plan administrator is given no authority to apply or interpret the evidence submitted to determine claimant's status as disabled or claimant's ability to recover under the policy.

12

*Napier v. Hartford Life Ins. Co.*, 282 F. Supp. 2d 531, 534 (E.D. Ky. 2003).[7]  The

court agrees with the reasoning stated in *Napier* and *Hoover*, and it finds that the

plaintiff's LTD policy did not confer discretionary authority on the defendant to

evaluate the plaintiff's disability status.  Accordingly, the court will review *de novo*

the defendant's decision to terminate the plaintiff's benefits.[8]

---

[7]As previously noted, the policy construed by the court in *Napier* contained language identical to that in the plaintiff's LTD policy.  Further, the policy in *Napier* was issued by the defendant here, and the plaintiff in *Napier* was also a Kentucky Central employee who filed for disability roughly two years after the plaintiff in this action.

Nonetheless, the defendant asserts that *Napier* is no longer of any precedential value because of the court's reliance in that case on *Perez v. Aetna Life Insurance Co.*, 96 F.3d 813 (6th Cir. 1996) ("*Perez I*"), a decision that was subsequently vacated.  *See* 106 F.3d 146 (6th Cir. 1997).  One year later, the Sixth Circuit determined *en banc* that, based on the language of the policy, the "arbitrary and capricious" standard should have been applied by the district court. *Perez II*, 150 F.3d at 557-58.  This court, however, has already found that the policy under review in *Perez I* and *Perez II* is distinguishable from the plaintiff's LTD policy.  Further, the decision in *Napier* was not based entirely or even predominantly on *Perez I*; it also focused on *Hoover* and its independent evaluation of the policy language.  For these reasons, the court rejects the defendant's claim that *Napier* is not helpful in resolving the standard-of-review issue here.

[8]Though the defendant notes that *Leeal* has been followed by district courts within the Sixth Circuit, this court is not persuaded that it should follow suit.  In one of these cases, the district court stated that, although it felt compelled to adopt the "arbitrary and capricious" standard "[p]ursuant to principles of *stare decisis*," it also indicated that it might have decided the issue differently if it were considering it "as a matter of first impression."  *Carpenter v. CNA, Continental Cas. Co.*, 254 F. Supp. 2d 730, 737-38 (S.D. Ohio 2002).  In the other, the court also concluded that *Leeal* and "the doctrine of *stare decisis*" suggested that a policy requiring "written proof of loss" vested discretion in a plan administrator.  *Willis v. ITT Educ. Servs., Inc.*, 254 F. Supp. 2d 926, 935 (S.D. Ohio 2003).  Neither of these cases reflects any adherence to the reasoning of *Leeal*, and, in light of *Hoover* and *Napier*, *stare decisis* neither mandates nor even suggests that *Leeal* be followed.

13

When applying a *de novo* standard in the ERISA context, the court reviewing a denial of benefits must determine whether the administrator made a correct decision. *Hoover*, 290 F.3d at 808-09. The administrator's decision is accorded neither deference nor a presumption of correctness. *Id.* at 809. The review is limited to the record before the administrator and the court must determine whether the administrator properly interpreted the plan and whether the insured was entitled to benefits under the plan. *Id.*

**III. Legal Analysis**

*A. The Plaintiff's Occupation*

As previously noted, the plaintiff's LTD policy requires that she be unable "to engage in all the material and substantial duties of [her] occupation" in order to receive benefits. The Sixth Circuit has previously approved administrators' decisions to construe the term "occupation" more broadly than terms like "position," "job," or "work," which are more related to a particular employee's individual duties. *Osborne v. Hartford Life and Accident Ins. Co.*, 465 F.3d 296, 299 (6th Cir. 2007); *see also Schmidlkofer v. Directory Distrib. Assoc., Inc.*, 107 Fed. Appx. 631, 633 (6th Cir. 2004) ("Many courts have upheld a plan administrator's interpretation of 'regular occupation' as meaning a general occupation rather than a particular position with a particular employer.").

The defendant apparently concluded that the plaintiff's "occupation" as a customer service representative was sedentary in nature. *See* AR 95, 173. The

14

court is not entirely convinced that this determination is correct, since the
defendant's claim file described her work history and transferable jobs as sedentary
to light.  *See* AR 29-30.  Nonetheless, since the court finds that the defendant
incorrectly concluded that the plaintiff was able to perform sedentary work, the
court will assume without deciding that the plaintiff's job was sedentary.

The court defines sedentary as follows:

Lifting 10 lbs. maximum and occasionally lifting and/or carrying such
articles as dockets, ledgers, and small tools.  Although a sedentary job
is defined as one which involves sitting, a certain amount of walking and
standing is often necessary in carrying out job duties.  Occasional
keyboarding is also required.  Jobs are sedentary if walking and standing
are required only occasionally and other sedentary criteria are met.

AR 173.  Though a requirement for "reaching" is not explicitly listed, the court
finds that this element is implicit in both the plaintiff's job description and the
descriptions of several other jobs that the defendant found were comparable to hers
(e.g., receptionist, file clerk, appointment clerk).  AR 29-30.

*B. The Medical Evidence*

The objective medical evidence in the administrative record shows that the
plaintiff is unable to perform her own occupation.  First, nearly every treating
physician that has examined her has stated, at one time or another, that she is
unable to perform the requirements of sedentary employment.  In 1990, Dr. Hylton
opined that the plaintiff had a permanent impairment rating of approximately 15%
and recommended that she avoid repetitive and prolonged bending, pulling, lifting,
or sitting activities.  AR 703.  In 2000, Dr. Royse found on two separate occasions

15

that the plaintiff was unable to remain seated for the time required to perform sedentary employment and stated that she could not perform sedentary work or return to her job. *See* AR 490-91, 503. Dr. Mogilevski found that she was limited in her ability to bend forward and move her neck. AR 462-63. In 2004, Dr. Royse again opined that the plaintiff could not work and noted that an MRI of her back showed abnormal results. AR 203, 210, 213. The plaintiff's neurosurgeon, Dr. Ravvin, also stated that the plaintiff had a significant back problem and was disabled. AR 66. Finally, Dr. Tallia stated in 2005 that the plaintiff could not maintain sedentary employment because prolonged sitting and forward posture worsen her back problems. AR 69.

Although the defendant was not required to give any special weight to the opinions of the plaintiff's treating physicians, those opinions should at least be considered in the same manner as those of physicians hired by the defendant. *See Napier*, 282 F. Supp. 2d at 538 (citing *Black and Decker Disability Plan v. Nord*, 538 U.S. 822 (2003)). The plaintiff's treating physicians have opined that the plaintiff is unable to work, and their opinions are supported by objective medical examinations of the plaintiff. The defendant erred in not assigning these opinions greater weight, particularly since they were corroborated by the FCE performed on the plaintiff in 2001. At that time, the examiner found that, although the plaintiff could perform some work at the sedentary level, she lacked the endurance to sustain such work on a long-term basis. AR 408, 434-37. The examiner's

16

conclusion that the plaintiff could not sit for more than two hours is similar to the

functional restrictions imposed by Dr. Royse.

The court also finds that the objective results of the FCE performed in 2004

support a finding that the plaintiff could not perform her own occupation, even

though the examiner concluded differently.  Indeed, the examiner's ultimate

recommendations were at odds with the clinical data.  For example, though the

examiner found that the plaintiff could sit for only 34-66% of a workday and that

the plaintiff demonstrated discomfort while sitting, *see* AR 290, she nonetheless

stated that the plaintiff had a "good tolerance to activities involving standing and

sitting" and that the plaintiff could maintain sedentary to light work for an eight-

hour workday.  AR 286.  Further, when the plaintiff complained that her pain

interfered with her ability to perform the FCE on Day 2, the examiner merely used

the plaintiff's results from Day 1 in reaching her opinion that the plaintiff could

perform sedentary work.  AR 286.  In doing so, the examiner even conceded that

"final results may not reflect [the plaintiff's capacity to work at a sedentary level]

due to [her] subjective intolerance due to pain . . . ."  AR 286.[9]  Thus, the 2004

FCE indicates that the plaintiff could perform only sedentary work by exerting

_____

[9]Though the defendant apparently doubts the plaintiff's complaints of pain
following Day 1 of the 2004 FCE, it has provided the court with no evidence from
which it could conclude that the plaintiff was malingering.  Indeed, the plaintiff's
claims are corroborated by her own testimony and her purchase of Ben Gay heating
wraps to ease her pain before she performed Day 2 of the FCE.  *See* AR 200.  The
court also notes that the examiner found that, including the five tests that the
plaintiff claimed that she was unable to complete due to her pain, the plaintiff
limited herself on only 11 of 29 activities.  AR 285.

17

herself to the point that she suffered debilitating pain.[10]  This result clearly does not support a finding that the plaintiff has the ability to hold a full- or part-time job at the sedentary level, and the defendant erred in relying on the 2004 FCE for the conclusion that she could do so.

Finally, the court is unpersuaded that the defendant was entitled to rely on the opinion of Dr. Marks, a non-examining consultant, over the objective evidence in the record.  Dr. Marks's opinion that, "considering purely physical considerations," the plaintiff was capable of performing sedentary work simply does not take into account the plaintiff's documented inability to work at a sedentary level on a sustained basis.  The maximum or peak level of activity that the plaintiff can attain is of little importance when one is determining whether she can maintain a steady job over a long period of time.  Because Dr. Marks failed to take this into account, the ALJ erred in relying on his opinion.

In sum, the plaintiff's treating physicians and one independent examiner have pronounced her disabled, and their opinions were based on objective medical data and are generally consistent with each other.  Though another examiner and a consulting physician claimed that she was able to perform sedentary work, their opinions are inconsistent with the evidence – including the results of the 2004 FCE – and are based on an unrealistic appraisal of the plaintiff's ability to work on a

---

[10]In this sense, the 2004 FCE and 2001 FCE both show that, although the plaintiff could perform sedentary work in the abstract, she could not sustain such work on an occupational basis.

long-term basis.  The court finds that, based on the evidence of record, the defendant's decision to terminate the plaintiff's benefits was incorrect.

### C. Remedy

Having determined that the defendant incorrectly terminated the plaintiff's claim for benefits, the court must now decide the remedy to which the plaintiff is entitled.  Since the court has concluded that the defendant's decision was erroneous, no factual determinations are left to be made by the defendant, and the court will therefore award the plaintiff the past-due benefits to which she is entitled under her LTD policy.  *Williams v. Int'l Paper Co.*, 227 F.3d 706, 715 (6th Cir. 2000) (holding that retroactive grant of benefits is appropriate without remanding the case when there are no factual determinations to be made).

### IV. Conclusion

Accordingly,

**IT IS ORDERED** that the plaintiff's motion to reverse the administrative decision (DE 11) is **GRANTED**.  The plaintiff is awarded the past-due benefits to which she is entitled under her LTD policy.

The plaintiff having requested an award of fees, cost and interest, **IT IS FURTHER ORDERED** that the plaintiff shall submit a motion for attorney's fees, costs, and pre-judgment interest to the court not later than 15 days from the date of entry of this order.  Response and reply deadlines shall run in accordance with the Local Rules.

19

Signed on September 5, 2007

*Jennifer B. Coffman*
JENNIFER B. COFFMAN, JUDGE
U.S. DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY